IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| YVETTE M. CADE, | ) | CASE NO. 5:17-CV-2206 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Yvette Cade ("Cade") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc.

10.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Cade protectively filed her application for DIB on February 26, 2014, alleging a

disability onset date of June 28, 2013.  Tr. 33, 182.  She alleged disability based on the

following: diabetes, fibromyalgia, arthritis (basal joint arthritis and osteoarthritis), plantar

fasciitis, insomnia/sleep apnea, depression, anxiety, gastroparesis, and chronic low back and hip

pain.  Tr. 207.  After denials by the state agency initially (Tr. 103) and on reconsideration (Tr.

121), Cade requested an administrative hearing (Tr. 141).  A hearing was held before

Administrative Law Judge ("ALJ") Charles Shinn on June 13, 2016.  Tr. 53-88.  In his June 28,

2016, decision (Tr. 33-45), the ALJ determined that there are jobs that exist in significant

numbers in the national economy that Cade can perform, i.e. she is not disabled. Tr. 43. Cade requested review of the ALJ's decision by the Appeals Council (Tr. 180) and, on August 23, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Cade was born in 1963 and was 50 years old on the date her application was filed. Tr. 203. She graduated from high school and previously worked as an optician. Tr. 60, 208. She last worked in July 2013. Tr. 208.

### B. Relevant Medical Evidence

In 2009 Cade underwent bilateral carpal tunnel release and in 2011 she had right carpal tunnel release. Tr. 558.

On April 17, 2013, Cade established care with Jean Dib, M.D., reporting that she had had shingles, eye twitching, dizziness with quick position changes, difficulty using her hands, and swelling in her right foot. Tr. 353. Dr. Dib assessed her with postherpetic polyneuropathy, dizziness and giddiness, and diabetes. Tr. 353. Dr. Dib continued her diabetes medications and referred her to an otolaryngologist for her postherpetic polyneuropathy and dizziness. Tr. 353. Her exam findings were normal. Tr. 354.

On July 22, 2013, Cade saw Karen Gade-Pulido, M.D., at Ohio Pain and Rehab Specialists, for fibromyalgia, with chief complaints of diffuse and chronic pain that had started about 25 years ago. Tr. 404-409. She had been referred by her family physician. Tr. 404, 408. She reported that nothing was improving her pain and it intensified with activity and work. Tr. 404. She had insomnia, abdominal pain, headache, felt achy and foggy, and was anxious and

somewhat tearful.  Tr. 404.  Upon exam, she had a mildly reduced range of motion in her hands and wrists, particularly on the right; she had a positive Finkelstein's test on the left; and was tender to palpation in this region of her hands bilaterally.  Tr. 406.  Her gait was normal.  Tr. 406.  She had pain in at least 11/18 trigger points.  Tr. 406.  Dr. Gade-Pulido opined that Cade met the diagnostic criteria for fibromyalgia.  Tr. 407.  She recommended physical therapy, commenting on Cade's sedentary lifestyle; opined that Cade had a vitamin D deficiency that could be contributing to her symptoms and prescribed a supplement; gave her a trial of paraffin baths for her hands; and prescribed medication that Cade had stated had helped in the past, Zanaflex and Ativan.  Tr. 408.

On October 29, 2013, Cade returned to Dr. Gade-Pulido complaining of numbness in her right hand along the ulna distribution.  Tr. 398.  She reported that her prior carpal tunnel surgeries never really helped, that her hands felt weak, and that she had a tendency to drop things.  Tr. 398.  She also complained of a knot in her right Achilles, prior injections from a podiatrist that had not helped, and prior back injections that had not helped.  Tr. 398.  She felt that her symptoms were progressing despite the fact that she had not been working.  Tr. 398. She had generalized fatigue.  Tr. 398.  Examination findings were much the same as her prior visit.  Tr.400-401.  Dr. Gade-Pulido commented that Cade had not followed through with the physical therapy recommendation and that she had admitted that she really did not do any regular physical activity.  Tr. 401.  Dr. Gade-Pulido gave her a slip for the YMCA "indicating the medical necessity of a routine exercise and aquatic program."  Tr. 401.  She prescribed gabapentin to improve Cade's sleep and reduce her pain.  Tr. 401.  She relayed that her associates in another office would be happy to see her in Dr. Gade-Pulido's absence but Cade indicated that she did not want to travel that far.  Tr. 401.

On May 19, 2014, Cade saw James Klejka, M.D., for testing to evaluate her carpal tunnel syndrome. Tr. 763. Cade complained of bilateral hand stiffness, throbbing pain, and difficulty making a fist. Tr. 763. Upon exam, she had mild limitations in her wrist motion and mild to moderate limitations in the flexion of her fingers. Tr. 765. She had normal sensation and coordination. Tr. 765. EMG testing revealed mild slowing of the median sensory latencies, "most consistent with residual from previous carpal-tunnel syndrome and is unlikely to represent a recurrent focal neuropathy." Tr. 766. There was no evidence of cervical radiculopathy or ulnar neuropathy. Tr. 766.

On August 27, 2014, Cade saw Arsal Ahmad, M.D., at Ohio Pain and Rehab Specialists for neck pain. Tr. 791. Her pain was aching and throbbing and she also reported poor sleep and fatigue. Tr. 791. Exam findings remained the same as her prior visit with Dr. Gade-Pulido. Tr. 792-793.

On September 29, 2014, Cade saw Dr. Ahmad complaining of pain in her right lower back, right hip, and right leg. Tr. 803. She was also scheduled to have an EMG in her right lower extremity. Tr. 803. The results were abnormal, showing evidence for right acute L-5 radiculopathy but no evidence of polyneuropathy. Tr. 804. Dr. Ahmad recommended a lumbar MRI, which was taken on October 3 and which showed a small posterior disc osteophyte complex at L5–S1. Tr. 848.

On October 12, 2014, Cade saw Ali Shakir, M.D., at Ohio Pain and Rehab Specialists for low back and right leg pain. Tr. 810-814. Her pain had begun 23 years ago, was progressively worsening, and was now constant. Tr. 810. Upon exam, she had an antalgic gait on the right, marked tenderness over the right L4-L5 and L5-S1 joint, restricted lumbar range of motion in all planes, and positive straight leg raises while sitting on the right. Tr. 813. She had normal

strength in all lower extremity muscle groups tested.  Tr. 813.  Dr. Shakir diagnosed her with thoracic or lumbar sacral neuritis or radiculitis, disorders of the sacrum, degeneration of the lumbar spine, and spondylolysis.  Tr. 813.

On February 19, 2015, Cade had a session of psychotherapy with Suzanne Beason-Hazen, Ph.D., for stress and anxiety.  Tr. 837.  Cade reported that her activity level was significantly limited by her chronic pain and she had chronically disturbed sleep that was helped by taking Ativan.  Tr. 837.  Dr. Beason-Hazen observed that Cade's raw scores on the Minnesota Multiphasic Personality Inventory (MMPI) indicated severe depression and severe anxiety and probable over-reporting of symptoms.  Tr. 837.  Accordingly, Dr. Beason-Hazen opined that "interpretation of the clinical scales should be approached with extreme caution."  Tr. 837.  She noted that Cade had had "extreme elevations on the Histrionic, Depression, and Hysteria scales, and severe elevation on the Paranoia, Psychasthenia, and Schizophrenia scales."  Tr. 837.  Dr. Beason-Hazen counseled Cade on sleep hygiene and discussed the possibility of using Abilify. Tr. 837.

On March 12, 2015, Cade saw Vincent Wake, M.D., at Omni Orthopedics upon referral from Dr. Shakir.  Tr. 841.  Cade reported lower back and leg pain for the last 20 years, currently 5/10 in severity.  Tr. 841. Dr. Wake commented that her pain has been treated conservatively. Tr. 841.  Upon exam, she had a slow but steady gait, hypersensitivity to light palpation on her lumbar spine, normal sensation (despite her reports of dysesthesia), less than maximum effort with muscle strength testing but 5/5 strength when emphasized, normal reflexes, and normal range of motion.  Tr. 842-843.  Dr. Wake remarked that the October 2014 lumbar MRI showed mild degenerative changes.  Tr. 843.  He diagnosed Cade with obesity, lumbar degenerative disc disease and spondylosis, low back pain and right lower extremity radiculitis in a non-

dermatological pattern.  Tr. 843.  He did not recommend surgery and instead opined that she should continue with her conservative care.  Tr. 843.

On April 13, 2015, Cade visited the Neurocare Center for headaches and dizziness.  Tr. 861.  The treatment note detailed that she had been found to have had severe depression and anxiety and also "probably over reporting of symptoms."  Tr. 861.  She was frustrated that no one could figure out what was wrong with her and the provider explained that her mood can cause a lot of her symptoms and that her depression and anxiety need to be addressed.  Tr. 861.  Upon exam, she was depressed and tearful at times.  Tr. 863.  She had normal motor strength and tone, was alert and oriented with intact concentration, normal senses and reflexes, normal coordination, and a normal gait and station.  Tr. 863-864.  She was assessed with generalized headache, depression, vertigo, chronic pain and stress.  Tr. 864.  It was recommended that she continue with her counseling and keep an upcoming appointment with Dr. Snavely for anxiety and depression.  Tr. 864.  She was to follow up with Mohammed Al Jaberi, M.D.  Tr. 865.

On April 14, 2015, Cade saw Mark Snavely, M.D., to establish psychiatric care after an absence in treatment at the behest of her neuropsychologist.  Tr. 956.  Cade stated that her main interest in seeing Dr. Snavely was to satisfy her neuropsychologist's expectation that she do so before the next level of investigation into her chronic unexplained distress.  Tr. 956.  Upon exam, she had a restricted affect and was anxious and tearful; she had a depressed mood; she was alert, oriented, well-groomed and cooperative; had preserved concentration, intact memory, normal speech, circumstantial thought processes, poor insight and fair judgment; and normal thought content without suicidal/homicidal ideation, hallucinations, paranoia, or delusions.  Tr. 957.  Dr. Snavely diagnosed depression and pain disorder with general medical and psychological factors.  Tr. 957.  Cade "makes it clear that she is not interested in any psychiatric medications" because

"they never work." Tr. 957. Dr. Snavely "discussed at length with her the cognitive behavior model toward chronic pain" and recommended she read the book "Full Catastrophe Living." Tr. 957. Cade was "ambivalent about engaging in this approach but agree[d] to consider." Tr. 957. Dr. Snavely also mentioned that Cade's MMPI scores were invalid and that she had had extremely elevated results. Tr. 958. If she were to consider treatment, he would recommend Remeron. Tr. 957.

On May 11, Cade saw Dr. Jaberi complaining of ongoing dizziness and facial pain. Tr. 858. Dr. Jaberi detailed her recent history; namely, that she had seen Dr. Snavely, who had opined that she is living with chronic distress from chronic physical and extrapyramidal symptoms and psychological factors, including unemployment, but that Cade was uninterested in any further medications. Tr. 858. Cade was getting frustrated and her doctors were getting frustrated. Tr. 858. Dr. Jaberi discussed cognitive therapy, advised her to read the book "Full Catastrophe Living," and to follow up with a psychologist. Tr. 858. Her exam findings were normal. Tr. 858-859. Dr. Jaberi concurred with Dr. Snavely's assessment and stated that medical doctors could no longer contribute to her care and that she could obtain a second opinion at the Cleveland Clinic if she wished to. Tr. 860.

On August 24, 2015, Cade saw Dr. Snavely and stated that she might be willing to try medication. Tr. 954. Dr. Snavely wrote that Cade was not motivated to do as he suggested— acceptance-based and functional improvement approaches to chronic pain distress—and was not motivated for psychotherapy and wished to pursue other care options "until 'somebody helps get this better.'" Tr. 955. Dr. Snavely gave her a trial of Remeron. Tr. 955.

On September 1, 2015, Cade saw Ajay Seth, M.D., at Spectrum Orthopaedics complaining of numbness, pain, swelling, and lack of mobility in her hands, all which become

worse with activity. Tr. 941. She also complained of pain in her neck and shoulders. Tr. 941. Upon exam, she had no atrophy, mild to moderate tenderness in her wrists, hands and fingers, full strength, and she was able to make full composite fists. Tr. 942. Dr. Seth ordered EMG testing and a cervical MRI. Tr. 943.

On September 16, 2015, Cade had an MRI of her brain due to dizziness and headaches. Tr. 857. The MRI showed a single small focus of suspected old ischemic/ degenerative change in the right and left parietal convexity and was otherwise normal. Tr. 857. On September 21, Cade had a cervical MRI which showed C3-C4 moderate left foraminal stenosis with probable compression of the left C4 nerve root due to severe degenerative joint disease. Tr. 52. Another EMG study was done on September 30, which showed mild bilateral carpal tunnel syndrome. Tr. 856.

On November 5, Cade returned to Dr. Seth complaining of pain in her hands and that she had difficulty making a fist. Tr. 929-932. Upon exam, she had full strength in her hands and could make composite fists. Tr. 930-931. Dr. Seth reviewed the EMG testing with Cade, noting that it shows "just mild recurrent CTS, this could be just residual from already having them released as well." Tr. 932. He remarked that her other provider did not feel that her hand issues were related to her neck. Tr. 932, 935. He recommended, and then performed, localized cortisone injections over her A1 pulleys where she had pain with direct palpation. Tr. 932.

On November 17, 2015, Cade returned to Dr. Snavely for what turned out to be her third and last visit. Tr. 952. Cade reported that, since her prior visit in August, she had "briefly" (for several days) tried Remeron but discontinued it and was not taking any psychiatric medications. Tr. 952. She reported that the Remeron caused intolerable morning fatigue and worsened her dizziness. Tr. 952. She complained of fatigue, poor sleep, anhedonia, and ruminating on her

chronic pain and limitations. Tr. 952. Upon exam, she was stressed, anxious and tearful with a restricted affect. Tr. 952. She had intact attention and concentration and intact memory. Tr. 952. Dr. Snavely wrote that Cade was not interested in trying psychiatric medications because she felt it is unhelpful and it just causes side effects. Tr. 953. They discussed functional rehabilitation approaches to chronic pain and Dr. Snavely "encouraged her to engage in robust psychotherapy with a local pain psychologist" and that Cade "is ambivalent but agrees to consider." Tr. 953.

On April 28, 2016, Cade saw Sheila Rubin, M.D., at the Cleveland Clinic for headaches and dizziness. Tr. 1072-1076. She reported having headaches for the last 30 years that have become more frequent over the last 4 years. Tr. 1072. She experienced pain in her temple, sensitivity to light, sound and smells, and was nauseated without vomiting. Tr. 1072. Her headaches remain severe for a few hours unless she treated them early with Tylenol and a cold compress, and sometimes this did not resolve them. Tr. 1072. She denied having been on daily medication for prevention of headaches. Tr. 1072. She reported past injections and IV treatments that did not provide relief. Tr. 1072. She also reported a sudden onset of dizziness three years prior, occurring when she first lies down, turns her head, or bends over. Tr. 1072. She has sleep apnea but reported that she cannot tolerate a CPAP machine. Tr. 1072. Dr. Rubin's impression was dizziness due to hyperventilation/anxiety disorder and chronic right-sided headaches. Tr. 1076. She recommended psychotherapy. Tr. 1076. She also prescribed Topamax for treatment of possible migraines and Imitrex as needed at the onset of severe headaches. Tr. 1076.

### C. Medical Opinion Evidence

#### 1. Treating Source

On March 10, 2011, more than 2 years prior to Cade's alleged onset date, Dr. Lehrer completed a physical capacity evaluation form on her behalf. Tr. 223. Dr. Lehrer listed Cade's diagnoses of arthritis, fibromyalgia and depression. Tr. 223. He opined that her prognosis was poor. Tr. 223. She could sit for 3 hours in an 8 hour day and stand/walk for 2 hours; occasionally lift 5 to 10 pounds; and could only work on a part-time basis. Tr. 223.

In November 2011, Dr. Tomasic completed a form on behalf of Cade with respect to her work capabilities based on her carpal tunnel and fibromyalgia. Tr. 224-226. Dr. Tomasic stated that, during flare-ups, Cade has significant pain that makes it difficult to do her job fitting eyeglasses to the best of her ability. Tr. 224-225. She would have flare-ups 2 to 3 times a month lasting 1 to 4 days per episode. Tr. 225.

On May 18, 2016, Dr. Kuentz completed a physical capacity evaluation form on behalf of Cade, listing her diagnoses as fibromyalgia, low back pain and depression with poor prognoses. Tr. 1134. During an 8 hour day, Cade could stand or walk a total of 2 hours in 15 minute increments; sit a total of 3 hours; and could lift 5 pounds occasionally. Tr. 1134. Her condition was described as worsening and she was not released to even part time work. Tr. 1134.

### 2. Consultative Examiner

On June 26, 2014, Cade saw Gary Sipps, Ph.D., for a psychological consultative examination. Tr. 779–784. Cade stated that her only psychological treatment consisted of counseling for "a few visits" in 2011. Tr. 780. Her daily activities included watching television, caring for her cats, reading the newspaper, socializing with family members and one friend, doing the laundry, picking up around the house, cleaning the bathroom, dusting, and handling her own personal hygiene. Tr. 780. Upon exam, Cade had good grooming and hygiene, no abnormal movements, was anxious but cooperative and pleasant, had appropriate eye contact,

normal flow of conservation and thought, clear and coherent speech, full orientation, average intellectual functioning, and normal mental content without delusions, paranoia, or hallucinations. Tr. 780–781. Her anxiety medications helped to a degree but she did not take her lorazepam regularly. Tr. 781. Dr. Sipps diagnosed panic disorder without agoraphobia in partial remission with medication and depressive disorder. Tr. 782. He assigned a GAF score of 52.[1] Tr. 782. He opined that Cade did not have limitations in responding appropriately to supervisors, maintaining concentration, persistence and pace and understanding, remembering and carrying out instructions. Tr. 782-783. She would have limitations responding appropriately to pressures in a work setting and expected work stressors; Dr. Sipps commented that Cade had not engaged in ongoing psychological counseling to improve her stress management and coping skills. Tr. 783.

On November 3, 2014, Cade saw William Mohler, M.A., for a psychological consultative examination. Tr. 821–825. She had driven herself to the appointment. Tr. 821. She stated that she had applied for disability based upon her hands, her dizziness, and her difficulty coping. Tr. 822. She reported daily crying spells and cried briefly during the interview. Tr. 822. She had been depressed since 2007 but had not received any treatment since 2011. Tr. 822. She spent most of her time in bed, performed some minor household tasks, and watched a lot of television. Tr. 822. She no longer had any friends, she saw her father and brother occasionally, and she identified no hobbies or interests. Tr. 822. Upon exam, she was depressed and had good grooming, a cooperative demeanor, adequate concentration, normal speech and language, low-

---

[1] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

normal memory, and low-normal insight and judgment.  Tr. 823–824.  Mohler diagnosed major depressive disorder, recurrent, moderate, and panic disorder.  Tr. 824.  Her prognosis was quite guarded and she was not receiving any treatment.  Tr. 824.  He saw no reason to question the reliability of her self-reports.  Tr. 824.  He opined that her depression and anxiety will impact her ability to deal with work stressors.  Tr. 825.

### 3. State Agency Reviewers

On June 12, 2014, state reviewing physician Edmond Garner, M.D., reviewed Cade's record.  Tr. 96-98.  Regarding her RFC, Dr. Garner opined that Cade could lift 10 pounds frequently, 20 pounds occasionally, and stand and/or walk six out of eight hours.  Tr. 96-97.  On July 19, 2014, state reviewing psychologist Karen Terry, Ph.D., reviewed Cade's record and opined that she could sustain simple, routine tasks and occasionally mild complex tasks that are routine in nature, with no fast paced performance or strict production quota requirements.  Tr. 98-99.  Both opinions were affirmed upon reconsideration.  Tr. 115 (Gerald Klyop, M.D., November 5, 2014); Tr. 116-117 (Paul Tangeman, Ph.D., November 21, 2014).

### D. Testimonial Evidence

#### 1. Cade's Testimony

Cade was represented by counsel and testified at the administrative hearing.  Tr. 55.  She lives in a house with her husband.  Tr. 61.  She takes medication for her anxiety, migraines, muscle spasms, and an anti-inflammatory.  Tr. 62.  She has diabetes and it has been controlled with an insulin pump since 2011.  Tr. 62.

Cade testified that she always has a low grade headache and she has a severe headache once a week.  Tr. 63.  When it is severe, she needs to stay lying down with an ice pack and it lasts a couple of hours up to a couple of days.  Tr. 63.  She takes medication for her severe

headaches; she did not tolerate the medication for daily headaches. Tr. 63. She has had severe headaches for about 4 or 5 years and she has had headaches for most of her life. Tr. 63. Neither she nor her doctors have been able to determine triggers for her headaches and have concluded that it is just weather and stress. Tr. 64.

Cade stated that she is going to have more releases done on her hands. Tr. 64. Her right hand won't close at all and her left hand is starting to not be able to open or close. Tr. 64. Dr. Seth is going to try to release two fingers to see what that will do and do some more injections. Tr. 64. The last time she had injections in her hands was the end of 2015. Tr. 64. There was no improvement. Tr. 64. She has muscle spasms in her shoulders and lower back and down her right leg to her foot. Tr. 64. She has a lot of pain and stiffness in her low back when she bends or turns. Tr. 65. It "rotates down the left leg where the muscles tighten up, a quarter to my right foot." Tr. 65. It is starting to affect her left hip and "could go down that way." Tr. 65. Her back pain is constant. Tr. 65. She has no relief with medications. Tr. 65. She will lie flat with a heating pad to help relax and then sit in different positions. Tr. 65. She uses a TENS machine at least three times a day to try to get her leg cramps to stop. Tr. 65. It helps calm it down enough so she can get a couple hours of sleep. Tr. 65-66.

Typically, Cade does not sleep through the night. Tr. 66. If she takes a Tylenol PM she may get an hour or two and then she's awake and then back to sleep; she gets 4-5 hours of sleep. Tr. 66. She sometimes takes naps during the day. Tr. 66. She has sleep apnea and tries to wear a mask. Tr. 66. When asked if she was being treated for fibromyalgia, Cade stated, "We tried." Tr. 66. She has tried different medication over the last 5-6 years and she does not tolerate them well. Tr. 66. They don't help her pain. Tr. 66. She was scheduled to have a bladder stimulator

but did not because she was afraid; it seems that every time she has surgery something else goes wrong.  Tr. 67.

Cade takes medication for anxiety but nothing for depression.  Tr. 67.  She has tried several medications but they cause her to be more depressed and she becomes less social and more withdrawn.  Tr. 67.  Her anxiety medication is "just to try to help me get some sleep, to try to help me not focus on so much negatively with my pain."  Tr. 67.  She "somewhat" has panic attacks the last few years, but not very often anymore because she does not socialize.  Tr. 67-68.  She is home most of the day and it is quiet and there is nothing she would encounter to set it off.  Tr. 68.  On a typical day she watches television, watches her cats, and sleeps or lies on her bed.  Tr. 68.  She does not cook; her husband cooks and makes sure there is something for her while he is at work or her mother-in-law will bring food over.  Tr. 68.  She stopped cooking the last two years because she kept dropping things and didn't feel safe.  Tr. 68.  She does not do much cleaning around the house.  Tr. 68.  She takes her own dishes out and puts them in the dishwasher and she throws sheets over the bed.  Tr. 69.  She will transfer laundry from the washer to the dryer and she does some "mild" dusting.  Tr. 69.  It is not comfortable for her to go to the grocery store by herself because of her dizziness and she gets overwhelmed.  Tr. 69.  The origin of her dizziness is undetermined but they are working on it.  Tr. 69.  The dizziness is constant if she is moving around or bending over.  Tr. 74.  If she picked up something off the ground she would be off balance for about 4-5 seconds.  Tr. 74.  Looking up would cause problems also.  Tr. 74.  She has fallen at times.  Tr. 75.

Cade has a driver's license and drives about twice a month.  Tr. 60, 69.  She drives to doctor's appointments or to the store if she has to.  Tr. 69.  On her husband's days off they like to go out to eat.  Tr. 69.  Three months before the hearing she and her husband went to Mexico for

three nights.  Tr. 70.  Her husband is a travel agent and takes groups there.  Tr. 70.  When asked how she handled the flight to Mexico, Cade answered, "It wasn't pleasant."  Tr. 78.  It was about 3 ½ to 4 hours "so I'm up, down.  Pillows here, pillows there."  Tr. 78.  She did not feel good when she got off the flight.  Tr. 78.  Her pain level was probably at a 6 "by the time you're at your final destination where you can just rest.  It's kind of the whole problem with the depression and the anxiety is that's my husband's job.  It's not what we signed up for, but—."  Tr. 78.  When asked why her husband's job as a travel agent required him to take her to Mexico, Cade replied that that is just what they used to do "and now it's come to a point that I can't do it, don't want to do it."  Tr. 79.  She conceded that she had just done it, however.  Tr. 79.  She had also been to Mexico with her husband in October 2014.  Tr. 79.  While she was in Mexico in March she did not go on any group outings and she "waited at the pool."  Tr. 79.

Cade gets her hair done about every 12 weeks and her nails done about every 3 or 4 weeks and it takes about 30-35 minutes.  Tr. 70.  She also goes tanning occasionally.  Tr. 77.  She gets her nails done at her husband's beauty shop.  Tr. 72.  She submitted a function report and stated that her husband helped her with it.  Tr. 70-71.  He wrote everything "and then I re-wrote it as I could."  Tr. 71.  He "kind of wrote it also" and she took her time and rewrote it, not all at once.  Tr. 71.  She wrote for probably 5-10 minutes or longer, so as to make sure it was legible, and then she stopped for an hour.  Tr. 71.

At the hearing, after sitting for 14-15 minutes, Cade's lower back, right leg and foot hurt.  Tr. 72.  The pain was 4 on a 10-point scale.  Tr. 72.  When asked if she sits for the whole time she gets her nails done, Cade answered, "If there's movement, there's movement because you're up washing your hands and things.  I know nail technicians have trouble doing my hands because they're so tight."  Tr. 72.  There are one or two people at the shop that know how to do them and

they "just work with me." Tr. 72. She has spasms in her hands quite a bit; once or twice an hour depending on what she is doing. Tr. 72. At night she has to lie her hands flat or they hurt severely. Tr. 73. When they spasm she can still move them and stretching them helps the pain. Tr. 73. She could not hold a screwdriver to perform her past work as an optical technician. Tr. 73.

At least once or twice a week she cannot function whatsoever. Tr. 75. She also has diarrhea every day, 1-4 times a day. Tr. 76. The cause is unknown and she has not started on some of the medication options but her gastroenterologist is working on it. Tr. 76. She also had seen a psychologist, Dr. Snavely, but was no longer seeing him. Tr. 77. He had recommended that she see a psychologist that deals with women living in pain and that is what the Cleveland Clinic had suggested also. Tr. 77. The Clinic has a program that you go through to readjust your lifestyle. Tr. 77. She was not in the program. Tr. 77. Instead, her pain management doctor that she is seeing now said that he would try some more injections and look at her new MRI "but that's probably down the road that I'm going to have to go through that program." Tr. 77.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Lynn Smith testified at the hearing. Tr. 82-86. The ALJ asked the VE to determine whether a hypothetical individual of Cade's age, education and work experience could perform work if the individual had the following characteristics: can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; can sit, stand and walk 6 hours in a normal workday; cannot climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch and crawl; can frequently handle and finger bilaterally; cannot drive commercially and must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; can perform simple routine tasks that do

not involve arbitration, negotiation or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; and cannot perform piece rate work or assembly line work. Tr. 82-83. The VE answered that such an individual could perform work as a sales clerk (2.6 million national jobs); information clerk (680,000 national jobs); and office helper (50,000 national jobs). Tr. 83. The ALJ asked the VE if her answer would change if the individual were limited to occasional handling and fingering and the VE stated that it would; such an individual could not perform the jobs identified or any other work. Tr. 83-84. The ALJ asked the VE if her answer regarding the first hypothetical individual would change if that individual would be off-task 20% of the workday and the VE stated that there would be no jobs for such an individual. Tr. 84. Fourth, the ALJ asked whether the first hypothetical individual could perform the jobs identified if she were late to work, left work early, or would be absent one day a week. Tr. 84. The VE answered that there would be no jobs for such an individual. Tr. 85. The VE explained that the customary tolerance would be absenteeism, lateness or leaving early only two times per month. Tr. 85.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

In his June 28, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 35.

2. The claimant has not engaged in substantial gainful activity since June 28, 2013, the alleged onset date.  Tr. 35.

3. The claimant has the following severe impairments: diabetes mellitus, fibromyalgia, lumbar and cervical spine degenerative disc disease, bilateral carpal tunnel syndrome, obesity, headaches/dizziness/vertigo, depression, pain disorder, and panic disorder.  Tr. 35.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 36.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; frequent handling and fingering bilaterally; avoid workplace hazards such as unprotected heights or dangerous moving machinery; no commercial driving; the claimant is limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others; and she cannot perform piece rate work or assembly line work.  Tr. 37-38.

6. The claimant is unable to perform any past relevant work.  Tr. 43.

7. The claimant was born in 1963 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 43.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 43.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 43.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 43.

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 28, 2013, through the date of this decision.  Tr. 44.

### V. Plaintiff's Arguments

Cade argues that the ALJ's decision is not supported by substantial evidence because he did not properly evaluate Social Security Ruling 12-2p.  Doc. 13, p. 1.

### VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### VII. Analysis

Cade argues that the ALJ's credibility determination is not supported by substantial evidence and that he did not properly evaluate SSR 12-2p, "Evaluation of Fibromyalgia."  Doc. 13, p. 1.

Cade stresses that she has been diagnosed with fibromyalgia.  Doc. 13, pp. 11-13.  But the fact that Cade has been diagnosed with fibromyalgia does not render her disabled.  *See Stankoski v. Astrue*, 532 Fed. App'x 614, (6th Cir. 2013) ("[A] diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits," citing *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008)).  And Cade's assertion that the ALJ did not

reference the findings leading to her fibromyalgia diagnosis (Doc. 13, p. 13) are baseless because the ALJ found that Cade's fibromyalgia was a severe impairment. Tr. 35.

Cade complains that the ALJ failed to mention, consider and evaluate "the principles set forth in [SSR] 12-2p," Evaluation of Fibromyalgia.[3] Doc. 13, p. 13. SSR 12-2p explains how a fibromyalgia diagnosis is reached and states that the record is considered and the five-step sequential process followed when determining whether a claimant has fibromyalgia and/or is disabled as a result. 2012 WL 3104869 (July 25, 2012). Cade does not identify a specific area in the five-step process she believes the ALJ ran afoul of with respect to her fibromyalgia. The ALJ did not err. *See Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399–400 (6th Cir. 2016) (holding that the ALJ complied with SSR 12-2p when he found that the claimant's fibromyalgia was a severe impairment and applied the five-step sequential evaluation process). Instead, she asserts that SSR 12-2p states that the ALJ will follow SSR 96-7p (assessing credibility), and that the ALJ failed to follow SSR 96-7p. Doc. 13, p. 14. SSR 96-7p was superseded by SSR 16-3p effective March 16, 2016, and applies to the ALJ's decision dated June 28, 2016.

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating source statements, treatment received, and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly

---

[3] The Court observes that, during his opening argument at the hearing, Cade's counsel stated that there were "four distinct areas" of Cade's most severe impairments: "One, her hands. Secondary, in a row – with hands is a real issue. Low back pain. She's also a diabetic and vertigo, dizziness, balance issues." Tr. 58. Cade's attorney did not mention fibromyalgia as one of the four distinct areas of Cade's impairments.

articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at 4.

Cade alleges that the ALJ did not follow the guidelines because he relied solely on the absence of objective medical evidence and "barely discussed" the other factors "in the little analysis he does do." Doc. 13, p. 14-15. Such an assertion is incorrect because the ALJ did not only rely on the absence of objective medical evidence and explained, in great detail, his credibility findings:

> The claimant's allegations are determined to be less than fully consistent with the evidence. The nature and degree of pain and functional limitations alleged by the claimant is not supported by medical and non-medical sources. Diagnostic test results and physical examination findings have been largely unremarkable, and the claimant has a relatively conservative treatment history. For example, an EMG/nerve conduction study performed in September of 2015 revealed evidence of "mild" bilateral median mononeuropathy at the wrist consistent with carpal tunnel syndrome (Exhibit 21F, pg. 2). Likewise, a physical examination performed in May of 2014 indicated tenderness over the wrists and medial and lateral epicondyles bilaterally, reflexes of 2/4 in the upper limbs, 2/4 in the ankles, and 3/4 in the knees, and "mild" limitation in wrist motion, but intact sensation to pinprick in the upper and lower limbs (Exhibit 12F, pg. 12). Moreover, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged. For example, she testified that she does laundry, drives twice per month, goes out to eat with her husband, shops, dusts, traveled out of the country with her husband multiple times last year, gets her hair and nails done, and goes to the tanning bed (hearing testimony).

> Regarding the consistency of the claimant's mental allegations, she has a very limited history of treatment, and there is no evidence of psychiatric hospitalization in the record. Such absence of documentation of ongoing treatment is inconsistent, and it seriously undermines allegations of disabling, or even severe, limitations of function, lasting twelve months in duration, and despite treatment (20 CFR 404.1520(a)(4)(ii) and 404.1509). Additionally, the claimant reported mostly mild symptoms during her consultative examination with Dr. Sipps and Mr. Mohler, and during her brief psychiatric sessions with Dr. Snavely, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues (Exhibit 13F, pg. 4; 17F, pg. 4; 25F, pg. 8). The claimant has a history of non-compliance with medical recommendations, further eroding the consistency of her allegations. For example, she told Dr. Snavely that she did not want to take any psychiatric medications because she felt that they did not work, in spite of his recommendation that she take them for her anxiety and depression (Exhibit 25F, pg. 8). In addition, the claimant was scheduled for a bladder stimulator surgery, but she

cancelled for unknown reasons (she testified that she cancelled this surgery because she was afraid) (Exhibit 23F, pg. 2-5). Thus, there are no indications in the medical record of limitations beyond the performance of light level work with the non-exertional restrictions listed above.

Tr. 41. In other words, in addition to objective medical evidence, the ALJ discussed Cade's treatment received (conservative), the fact that her treatment was sporadic and that she routinely did not comply with recommended treatments. *See* SSR 16-3p, 2016 WL 1119029, at *8 ("if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). And the ALJ discussed Cade's daily activities. *See id.*, at *7 (the ALJ considers the claimant' daily activities).

Cade argues that the ALJ's reasoning is not specific to her fibromyalgia but instead involves her hand impairment. Cade does not cite legal authority directing an ALJ to assess the credibility of a claimant's statements as to each independent impairment. Moreover, Cade's providers routinely explained to her that she needed psychiatric treatment and therapy to address her chronic pain issues, advice that she routinely ignored. In other words, the record shows that Cade's complaints about her chronic pain caused by fibromyalgia are directly related to her refusal to engage in psychiatric medication and therapy, which the ALJ considered.

Cade submits that the ALJ ignored the fact that she consistently reported her statements to providers. Doc. 13, p. 16. But "a claimant's subjective complaint is not rendered credible solely because it is laundered through a provider's notes." *Ormiston v. Comm'r of Soc. Sec.*, 2012 WL 7634624, at *7 (N.D.Oh. Dec. 12, 2012), *report and recommendation adopted*, 2013 WL 773885 (N.D.Oh. Feb. 28, 2013). Finally, Cade contends that she has good days and bad days and that, per her treating physicians' opinions (rendered in 2011, two years prior to her

alleged onset date), she can only work part time and/or would miss a significant amount of work. Doc. 3, pp. 17-18. The ALJ discounted these opinions and Cade does not advance an argument challenging the ALJ's assessment of the opinion evidence.

The ALJ did not err and his decision is supported by substantial evidence. It must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: September 4, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge